liSCHOTT, Chief Judge.
Plaintiff was injured on June 24, 1991, when she struck her ankle on a board protruding from a bed in her room at Holiday Inn where she was a guest. After a bench trial, the court awarded her $250,000 in damages. Holiday Inn appeals disputing both liability and quantum.
There were two double beds in the room. Plaintiff had made a call on the telephone on a nightstand between the beds. As she was returning to the other side of the room she struck her left ankle on the protruding board which was covered by carpet. Photographs of the board are mute testimony that a hazard existed and that an accident like plaintiffs was sure to happen. Defendant’s suggestion that the mattress must have been moved so as to disturb the board hardly absolves the defendant of liability based upon strict liability or negligence. No basis exists for this court to reverse the trial court on this simple resolution of an issue of fact. We readily affirm the judgment on liability and turn to the quantum issue which is considerably more troublesome.
Plaintiff was born on March 15, 1948. Before this accident she had long standing medical problems arising out of hemoglobin SC disease which is a type|2of sickle cell anemia. In 1974, she had a total right hip replacement, and in 1983 she had a resection of this hip. Because of this surgery, her right leg was shorter than the left so that the stress was concentrated on her left leg. Following the accident, Holiday Inn arranged for plaintiff to be examined at Hotel Dieu Hospital. X-rays showed no fractures and the diagnosis was a contusion of the ankle. Upon returning to her home in Baton Rouge, plaintiff went to her personal physician, Dr. Henry C. Dixon, an internist.
Plaintiff saw Dr. Dixon on June 27. He found no swelling or edema but her ankle was tender to palpation. His impression was that she had a contusion and a possible hairline fracture. He scheduled her for therapy three times a week and referred her to an orthopedist, Dr. Randall Lea. Dr. Dixon evaluated her on July 18, August 26, and October 2. Throughout this period she received physical therapy, she continued to improve, and he discharged her on October 2, telling her she would probably have pain in her ankle off and on for three to six months. She came back on October 30, 1991, complaining of pain in the ankle. Dr. Dixon found tenderness, slight swelling, and edema. He prescribed pain medication and told her to return to him in two weeks, but she never did return.
In the meantime, plaintiff was first seen by Dr. Lea, the orthopedist, on June 28, 1991. She was referred to him because of the possibility of a fracture of the left ankle. He elicited the history of her disease and the hip surgeries and she stated that she was having pain in the right hip because of having to shift her weight from the injured left leg. He found no swelling and no bruising but only tenderness. He did not believe she had a fracture but he did not rule out the possibility of a hairline fracture. He placed a gel cast on the ankle in order to limit its motion without immobilizing it. He saw her on July 9 and July 30. By this time she was improving but he kept her in the cast and |8on crutches. Between the visits of August 20 and October 1991, she continued to improve reporting little problems with the ankle and improvement in the hip as well. At this point he discharged her with the understand *57 ing she would return as needed. She did so on November 19 complaining of pain in the ankle with the change in the weather. He thought physical therapy was in order but did not yet see the need for a bone scan. He never saw her again.
Plaintiff also saw Dr. Lynn Hamilton, an orthopedist, on August 21, 1991. He had previously treated her for the right hip in 1984. She was still wearing the gel cast but she said she had discontinued use of the crutches the day before. She told him she sprained the right hip when she fell. He found a mild limp and some stiffness and little pain with stress on the hip. He reassured her and told her to return in six months if pain persisted or intensified. She did not return until November 1992, fifteen months later. X-rays of both hips which he took in August 1991 were unchanged from those taken in 1984 and 1988.
In March 1993 plaintiff was sent by her employer, EXXON, to Dr. Adria Johnson, a physical rehabilitation specialist. She found only mild tenderness in the ankle. Plaintiff was still wearing the gel cast. Dr. Johnson wanted to discontinue this cast and eventually got plaintiffs then treating physician, Dr. Elmorshidy to concur. After a course of treatment, by July 1993 Dr. Johnson found plaintiffs tolerance to therapies was much better and the function of her left ankle much improved. It had a good range of motion and good strength. On August 4, 1993, she released plaintiff relative to her ankle, but she understood that Dr. Elmorshi-dy would continue treating her for her hip problems.
On February 24, 1992, plaintiff first saw Dr. Essam Elmorshidy, an orthopedist. On examination of the ankle he found moderate swelling and | tenderness and limited range of motion. He diagnosed post traumatic sy-novitis or inflammation of the lining of the joints, the first step in the development of arthritis. After a course of treatment consisting of anti-arthritic and anti-inflammatory medications, massage, and heat, the swelling and tenderness persisted. Following an injection of cortisone in March she had a severe reaction requiring her to be hospitalized. The ankle was better at times but had flare-ups. In June she was given a second injection of cortisone. At this time she began to complain of pain in the back and both hips. He attributed these problems to the ankle injury. After conservative treatment failed to give her relief, Dr. Elmorshidy concluded that surgical removal of the synovial membrane was the only alternative left to get her left leg back to normal and thereby to get the pain in the back and her hip problem under control.
On September 22, 1992, Dr. Elmorshidy performed a partial synovectomy following which her swelling and pain decreased and her range of motion improved. He thought her response to the surgery was “sort of dramatic.” He continued to treat her for her hip and back but he thought she had a “fair recovery” for her ankle. He explained that she was disabled because of her underlying problem of sickle cell anemia and her hips but he estimated that the post traumatic synovitis left her with a ten percent disability only because of the possibility of degenerative arthritis in the future not because there was any existing functional disability from the ankle at that time.
The trial judge awarded plaintiff $250,000 in a lump sum. She gave no reasons for judgment. However, plaintiff produced an economist who determined that from the date of the trial on May 22, 1995, she lost $77,286.00 in wages and for the remainder of her work life expectancy of almost twelve years she would lose $625,739.00 in wages.
Regarding the lost wages, the testimony of plaintiffs own physician Igtogether with that of Dr. Johnson, the rehabilitation expert, established that her disability from the ankle came to an end at the end of July 1993. Dr. Elmorshidy specifically found no existing disability from the ankle. He speculated that she might develop arthritis in the ankle at some time in the future, but this had nothing to do with her condition in July 1993. Thereafter, she was relegated to only five hours a day of sedentary work not because of the ankle but because of her other problems which were neither caused nor aggravated by the ankle injury. Again, this was the unanimous opinion of every physician and was consistent with plaintiffs own testimony that *58 following the synovectomy the pain in her ankle diminished. Plaintiffs disability retirement in 1994 was simply not the result of her ankle injury.
Returning to plaintiffs economist, he computed past loss of wages from June 1991 until May, 1995 at $77,286 for this period of 48 months or $1,610.13 per month. Considering that the disability from the ankle ended in July 1993 she is entitled to loss of wages for 25 months or a total of $40,253. She is not entitled to any loss of future wages or loss of earning capacity since none of this is attributable to the ankle injury.
Returning to the trial court’s lump sum award of $250,000 we attribute $40,253 of that to lost wages. Plaintiff proved only $2,015 in medical expenses and no other special damages. Deducting this $42,268 of proven specials we know that the award for general damages amounts to $207,432. The issue is whether this award constitutes an abuse of the trial court’s discretion.
In order to address the issue of quantum we must consider the question of whether or not plaintiff actually developed synovi-tis in her ankle. Dr. Elmorshidy thought so but every other physician in the case thought not. This includes Drs. Dixon, Lea, and Hamilton along with Dr. Joe Morgan, an orthopedist who examined plaintiff at defendant’s request on July 22, 1993, and |6Pr. James Laborde, an orthopedist who examined her also at defendant’s request on June 2, 1994. But the problem is not simply a number of physicians called by the defendant disagree with plaintiffs lone treating physician. The problem is that there is objective evidence that Dr. Elmorshidy’s diagnosis was dead wrong and his surgery was unnecessary.
Following the surgery, tissue which Dr. Elmorshidy removed was given by him to a pathologist for examination. The pathologist reported no evidence of synovitis, only that the material was fat tissue with blood. The other physicians considered this to be conclusive that the diagnosis of synovitis was clearly erroneous so that the surgery was unwarranted, but Dr. Elmorshidy minimized the significance of the report. He insisted that he removed the synovial membrane and speculated that those who actually sent the tissue to the pathologist picked out the piece of fat tissue to send and failed to send any synovial tissue which was in small pieces. This excuse is unacceptable because it was Dr. El-morshidy’s obligation to see that the synovial tissue was sent to the pathologist. Furthermore, Dr. Laborde testified that the synovial tissue is attached to the fat and the surgeon would have had to separate it and send only fat to the pathologist. The only logical conclusion is that Dr. Elmorshidy removed no synovial tissue.
We are left with the conclusion that Dr. Elmorshidy performed unnecessary surgery on plaintiff because he removed no synovial tissue and plaintiff never had synovitis. Holiday Inn, as the original tortfeasor, is nonetheless liable for the resulting damages. Lambert v. U.S.F. & G, 629 So.2d 328 (La.1993).
Thus plaintiffs compensable injury consisted of a contusion of the ankle and a possible hairline fracture. Because of her preexisting hip condition she had more pain and more difficulty with the injury than'a normal person would |7have. By the end of 1991, which was six months post accident she was discharged from the care of her own physicians, Drs. Dixon and Lea, as recovered except for expected occasional flareups thereafter. She had more trouble with the ankle leading her to Dr. Elmorshidy who treated her for the ankle until July 1993 and who performed surgery which was unnecessary and prolonged her recovery. The highest amount awardable for general damages within the trial court’s broad range of discretion is $60,-000. See for example Terro v. Casualty Reciprocal Exchange, 93-593 (La.App. 3rd Cir. 2/2/94), 631 So.2d 651, 656 (La.App. 3 Cir.1994), writ denied. 94-0522 (La. 4/22/94), 637 So.2d 157; Miller v. Great Atlantic & Pacific Tea Co., 510 So.2d 695, 697 (La.App. 1 Cir.1987), writ denied 513 So.2d 1213. Accordingly, the judgment appealed from is affirmed, but the amount of the award is reduced to $102,268.

AMENDED AND AFFIRMED.